J-A25040-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JAMES SHERIF T GIBSON JR. | : | |
| | : | |
| Appellant | : | No. 2824 EDA 2023 |

Appeal from the Judgment of Sentence Entered August 23, 2023
In the Court of Common Pleas of Bucks County
Criminal Division at No(s):  CP-09-CR-0000019-2023

BEFORE:  OLSON, J., DUBOW, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.: **FILED FEBRUARY 24, 2025**

James Sherif T Gibson, Jr. ("Gibson") appeals from the judgment of sentence following the denial of his motion to suppress.  We affirm.

The Commonwealth charged Gibson with a series of crimes relating to events on an early morning in October 2022.  Gibson filed a pre-trial motion seeking, *inter alia*, to suppress a gun and drug paraphernalia seized during the incident; he asserted the police lacked reasonable suspicion or probable cause to stop and search him.  *See* Gibson's Omnibus Pretrial Motion, 5/1/23, at unnumbered 2-3.  The court held a hearing on Gibson's motion in May 2023, and provided the following summary of the testimony presented at the hearing:

> At 3:48 a.m. on October 20, 2022, Lieutenant [Sean] Cosgrove,[1] Officer [Michael] Grebloski, and Officer [Eric] McEwen of the Bristol Township Police Department responded to a report of

_____

[1] Cosgrove was promoted to Lieutenant later on the day of the incident.

trespassing at 318 Park Avenue, in West Bristol, PA. Upon arrival at the scene, officers made contact with Daryl Robertson, the apparent owner of the residence, on the front lawn of the property. Mr. Robertson informed the officers that a man was in his home without his permission[] and refused to leave. Mr. Robertson described the unwelcome[] individual in his home as a black male with [] dreadlocks . . .. Mr. Robertson told officers that this individual fled on foot from his residence toward Route 413.

Lieutenant Cosgrove[] then searched the surrounding area in his marked patrol vehicle. In his search, Lieutenant Cosgrove spotted no pedestrians on the Park Avenue, likely due to the late hour, []or on the surrounding streets of Western Avenue and Leedom Avenue.[7] Approximately two minutes after leaving Mr. Robertson's residence, Lieutenant Cosgrove eventually spotted one male subject walking northbound on the roadway on Old Rodgers Road. This male drew Lieutenant Cosgrove's attention as he was in close proximity to the residence, was walking in the direction that Mr. Robertson had indicated, and matched the provided suspect description, having [] dreadlocks . . ., and appearing to be a black male. Once Lieutenant Cosgrove spotted this male subject, he did not honk at him, nor activate his siren, nor activate his overhead lights. Lieutenant Cosgrove activated his spotlights and observed this male in the middle of the street in the area of the double yellow lines which divide the lanes of traffic, walking backwards toward[] the curb of the street.

> [7] Similarly, in their searches of the surrounding area for the trespassing subject, neither Officer Grebloski nor Officer McEwen observed anyone other than [Gibson] in the surrounding area.

Around this time . . . [Gibson] noticed Lieutenant Cosgrove's patrol vehicle[] and began walking toward[] it. By the time Lieutenant Cosgrove had parked his patrol vehicle, [Gibson] was so close to Lieutenant Cosgrove's vehicle that it almost prevented him from exiting it. [Gibson] then began questioning Lieutenant Cosgrove as to why he was there. Lieutenant Cosgrove then had to ask [Gibson] to back away from his vehicle so he could even get out of his patrol vehicle and talk to [him]. Lieutenant Cosgrove asked [Gibson] his name, to which he replied, "James," not supplying his last name.

Once Lieutenant Cosgrove exited the vehicle and activated his flashlight to more clearly view [Gibson], he immediately observed the handle of a handgun sticking out of the top of [Gibson's] cargo-pant pocket, which was located on the middle of [Gibson's] thigh, on the front of his body. As [Gibson] continued to approach [Lieutenant] Cosgrove, the firearm was displayed outwardly on his person. Lieutenant Cosgrove also was able to see the imprint of [] the rest of the handgun though [Gibson's] jeans. Lieutenant Cosgrove then drew his firearm and ordered [Gibson] to . . . put his hands on his head. [Gibson] did not immediately comply[] but placed his hands on his head. At this time, Officer McEwen had arrived on the scene and ran up and approached [Gibson], then placed him in handcuffs. Lieutenant Cosgrove then removed the firearm from [Gibson's] person and placed it in the front seat of his patrol vehicle. After the firearm was removed, Officers Grebloski, who had also arrived on scene by this time, and McEwen[] patted down [Gibson's] person for additional weapons. During this pat-down, Officer Grebloski recovered a handful of small, plastic[,] "snap-top" containers, commonly used to package crack cocaine.[25] Also during this interaction, Officer Grebloski was unable to find any identifying information on [Gibson's] person.

> [25] Officer Grebloski testified that in his training and experience, he immediately recognized these snap-top containers as drug paraphernalia.

[Gibson] was generally uncooperative once detained. During this encounter, Lieutenant Cosgrove determined that [Gibson] was likely under the influence of alcohol, as he observed that [Gibson] was unsteady, spoke as if he was intoxicated, and used profanity. Lieutenant Cosgrove asked [Gibson] for his last name, but [Gibson] did not provide it. After being handcuffed, [Gibson] demanded to be placed in the patrol vehicle. Based on [Gibson's] apparent intoxication, the fact that he had had a firearm on his person, and [Gibson's] own request, officers detained [Gibson] in the back of a patrol vehicle while officers continued their investigation of the trespassing report and [Gibson's] possession of a firearm. During this time, at [Gibson's] own request, Lieutenant Cosgrove examined the serial number on [Gibson's] firearm and reported the information via his radio system to ascertain its registration and ownership.

While [Gibson] was detained in the patrol vehicle, Officer McEwen . . . drove the short distance back to the residence and picked up the complainant, Mr. Robertson, and brought him to the location where [Gibson] was being detained, so that Mr. Robertson m[ight] possibly identify [Gibson] as the man who entered his residence. Once Mr. Robertson arrived, officers shined their flashlights on [Gibson] so Mr. Robertson could clearly identify him. Mr. Robertson then identified [Gibson] as the individual who was present in his home earlier that evening. Following this positive identification, [Gibson] was placed under arrest and transported to Bristol Township Police Station.

Following [Gibson's] arrest, Lieutenant Cosgrove investigated the firearm seized from [Gibson's] person. Lieutenant Cosgrove classified the firearm as a unique five-shot revolver . . .. By this time, Lieutenant Cosgrove had received verification that the firearm had been reported stolen about two to three years prior to [Gibson's] arrest.

*See* Trial Court Opinion, 1/9/24, at 1-5 (record citations and most footnotes omitted, some footnotes renumbered, capitalization standardized).

The parties agreed to incorporate the notes of testimony of the May 22, 2023, suppression hearing at a subsequent, stipulated, non-jury trial. *See* N.T. 6/6/23, at 5. The court found Gibson guilty of persons not to possess firearms, possession of a firearm without a license, receiving stolen property, and possessing drug paraphernalia.[2] The court imposed an aggregate sentence of seven to fourteen years of imprisonment, and determined Gibson was ineligible for RRRI. Gibson filed a timely motion for reconsideration of

---

[2] *See* 18 Pa.C.S.A. §§ 6105(a)(1), 6106(a)(1), 3925(a), 35 P.S. § 780-113(a)(32). The criminal trespass charge was *nol prossed*.

sentence, which the court denied after a hearing. Gibson timely appealed and he and the trial court complied with Pa.R.A.P. 1925.

On appeal, Gibson raises two issues for our review:

A. Did the trial court err in denying [Gibson's] motion to suppress because the detention of [Gibson] was not supported by reasonable suspicion?

B. Did the trial court err in denying [Gibson's] motion to suppress because the custodial detention of [Gibson] was not supported by probable cause?

Gibson's Brief at 4 (issues reordered) (capitalization standardized).

Gibson claims the court erred by finding the police had a proper basis for his detention.

The Commonwealth bears the burden at a suppression hearing of establishing the challenged evidence was not obtained in violation of the accused's rights. *See* Pa.R.Crim.P. 581(H). The credibility of witnesses and the weight to be accorded their testimony is solely within the province of the suppression court. *See Commonwealth v. Dutrieville*, 932 A.2d 240, 242 (Pa. Super. 2007). Although a reviewing court is bound by a suppression court's findings of fact if they are supported in the record, it conducts plenary review to determine if the court properly applied the law to the facts. *See Commonwealth v. Dunkins*, 263 A.3d 247, 252 (Pa. 2021); *Commonwealth v. Dales*, 820 A.2d 807, 812 (Pa. Super. 2003). This Court may reverse if the suppression court drew erroneous legal conclusions from the evidence. *See Dunkins*, 263 A.3d 252.

There are three types of encounters between the police and citizens: (1) mere encounters, which carry no official compulsion to stop or respond, (2) investigative detentions, which are temporary unless they result in the formation of probable cause and do not possess the coercive conditions of a formal arrest, and (3) custodial detentions, where the nature, duration, and conditions of an investigative detention "become so coercive [] as to constitute the functional equivalent of an arrest." ***Commonwealth v. Spence***, 290 A.3d 301, 314 (Pa. Super. 2023) (citation omitted).

In reviewing whether reasonable suspicion exists, this Court examines the totality of the circumstances to determine if there exists "a particularized and objective basis for suspecting an individual of criminal activity." ***Commonwealth v. Knupp***, 290 A.3d 759, 767 (Pa. Super. 2023) (citation and brackets omitted). To establish reasonable suspicion, an officer "must articulate specific observations which, in conjunction with reasonable inferences derived from these observations, led him reasonably to conclude, in light of his experience, that criminal activity was afoot." ***Commonwealth v. Garcia***, 311 A.3d 1138, 1145 (Pa. Super. 2024) (citation omitted). ***See Alabama v. White***, 496 U.S. 325, 329 (1990) (quoting ***Terry v. Ohio***, 392 U.S. 1, 22 (1968) (stating a police officer has reasonable suspicion when he is "able to articulate something more than an 'inchoate and unparticularized suspicion or hunch'" that criminal activity is afoot)); ***accord Commonwealth v. Hughes***, 908 A.2d 924, 927 (Pa. Super. 2006).

Although reasonable suspicion requires something more than an observation of a person doing something many people can do legally, *see* *Garcia*, 311 A.3d at 1145, the likelihood of criminal activity sufficient to establish reasonable suspicion "falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Arvizu*, 534 U.S. 266, 274 (2002). Even a combination of innocent facts, when taken together, may warrant further investigation by the police officer. *See Commonwealth v. Harris*, 176 A.3d 1009, 1021 (Pa. Super. 2019). *See also Arvizu*, 534 U.S. at 277 (stating that reasonable suspicion "need not rule out the possibility of innocent conduct"); *see also Garcia*, 311 A.3d at 1145 (stating that "[w]ithout any possibility of innocence, there would be nothing for the officer to investigate"). A court assessing reasonable suspicion considers the totality of the circumstances giving due weight to the specific reasonable inferences the police officer is entitled to draw from the facts considering his experience. *See Harris*, 176 A.3d at 1021.

The mere possession of a concealed firearm is not sufficient to support an inference that criminal activity is afoot. *See Commonwealth v. Hicks*, 208 A.3d 916, 947 (Pa. 2019); *Commonwealth v. Holley*, 321 A.3d 1089, 1095 (Pa. Super. 2024). The Fourth Amendment permits a seizure only when officers articulate facts showing the conduct underlying the detention results "from actual suspicion of criminal activity in a meaningful sense of that term." *See id*. (citing *Hicks*, 208 A.3d at 950-51).

Gibson argues Lieutenant Cosgrove subjected him to an investigative detention by pointing a gun at him and ordering him to raise his hands, and further asserts the police had not personally observed suspicious behavior and did not have sufficiently specific identification information to support an investigative detention. **See** Gibson's Brief at 22-27, citing **Commonwealth v. Jackson**, 519 A.2d 427 (Pa. Super. 1986).

The trial court concluded the initial police interaction with Gibson before he was told to raise his hands constituted a mere encounter. It further concluded that, even if the encounter were regarded as an investigative detention, the evidence offered at the suppression hearing supported a detention. The trial court noted the victim's report of the crime to police at approximately 3:48 a.m., the victim's description of Gibson as a black male with dreadlocks, and the victim's indication that Gibson ran in the direction of Route 413. **See** Trial Court Opinion, 1/9/24, at 10-13. With this information relayed by the victim to the officers, Lieutenant Cosgrove set off in that direction. **See** N.T., 5/22/23, at 12-13. Lieutenant Cosgrove testified the streets were deserted due to the early morning hour, but within two minutes of his search of the deserted streets he spotted a male subject walking down the middle of the road. When he drew closer he noticed the lone pedestrian was a black male with dreadlocks. **See id**. at 16-17. The court also noted Gibson's conduct in keeping Lieutenant Cosgrove pinned into his car and the obvious presence of a firearm in Gibson's pants. **See id**.

The record supports the suppression court's assessment that Lieutenant Cosgrove's interaction prior to drawing his gun was a mere encounter. Lieutenant Cosgrove did not use or display force to initiate the encounter with Gibson – he merely trained a spotlight at him and Gibson voluntarily walked over to the officer without being ordered to do so. *See* Trial Court Opinion, 1/9/24, at 2. Lieutenant Cosgrove did not display a weapon, compel compliance, block Gibson's passage, or impede his movement. *See Commonwealth v. Newsome*, 170 A.3d 1151, 1155-56 (Pa. Super. 2017) (finding that a mere encounter occurred when a uniformed officer got out of his police vehicle and asked the appellee multiple times to come talk to him, especially because the officer did not brandish his weapon, engage in an overwhelming show of force, tell the appellee he was not free to leave, or obstruct the appellee's movements).

As noted by the suppression court, by the time Lieutenant Cosgrove encountered Gibson reasonable suspicion existed to conduct an investigatory detention. The police had the victim's report of the crime and a physical description of Gibson, Gibson was spotted near the crime scene within minutes of receiving the victim's report and his location was consistent with the direction he fled according to the victim's report on otherwise deserted streets shortly before 4:00 a.m., and Gibson fit the physical description given to the officers. These facts provided reasonable suspicion that criminal activity was afoot. *See Arvizu, Harris*. *See also In Interest of J.G.*, 145 A.3d 1179,

1186 (Pa. Super. 2016) (finding police had reasonable suspicion to stop appellee where, *inter alia*, he matched the race and clothing description of a suspect and was found near the crime shortly after it occurred). Notably, unlike in **Hicks**, Gibson's possession of a gun was not the sole basis of alleged criminal activity; rather, it was one factor in the trial court's reasonable suspicion assessment. **See Holley**, 321 A.3d at 1095 (stating that mere possession of a concealed firearm alone is not sufficient to allow the inference of criminal activity, but a seizure may be supported by accompanying actual suspicion of criminal activity).[3] Thus, the record supports the trial court's findings and conclusions and Gibson's first issue fails.

Gibson's second issue asserts the police subjected him to custodial detention without probable cause when they ordered him to raise his hands, his mere possession of a gun did not establish probable cause, and the police lacked probable cause to stop him for criminal trespassing because the victim had not identified him at the time of arrest. **See** Gibson's Brief at 12-21.

_____

[3] **Commonwealth v. Jackson**, 519 A.2d 429 (Pa. Super. 1986), which Gibson cites, undermines rather than advances his claim. In that case, after receiving a report a man had attempted to kick in a door, the police found Jackson near the reported crime, patted him down, and then searched his closed gym bag. **See Jackson**, 519 A.2d at 429. The **Jackson** Court concluded reasonable suspicion supported the original stop, but that the immediate search of the closed gym bag was improper. **See id**. at 442. The police possessed reasonable suspicion here as they did in **Jackson** based on the report of the crime and Gibson's presence in the otherwise deserted streets matching the victim's description.

A court assessing whether a detention has evolved into an arrest considers the totality of the circumstances including:

> the cause for the detention, the detention's length, the detention's location, whether the suspect was transported against his or her will, whether physical restraints were used, whether the police used or threatened force, and the character of the investigative methods used to confirm or dispel the suspicions of the police. . ..

*Spence*, 290 A.3d at 314-15 (citation and brackets omitted). As this Court has explained, probable cause exists:

> when the facts and circumstances within the police officer's knowledge and of which the officer has reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested. The question we ask is not whether the officer's belief was correct or more likely true than false. Rather, we require only a probability, and not a *prima facie* showing, of criminal activity. Whether probable cause exists is a highly fact-sensitive inquiry that must be based on the totality of the circumstances as viewed through the eyes of a prudent, reasonable, cautious police officer guided by experience and training.

*Commonwealth v. Sears*, 311 A.3d 34, 39 (Pa. Super. 2024) (internal citations and quotation marks omitted). That a police officer draws a gun does not in itself transform an investigative detention into an arrest. *See Commonwealth v. Dix*, 207 A.3d 383, 388 (Pa. Super. 2019). Additionally, for their safety officers may handcuff a suspect during an investigative detention. *See Spence*, 290 A.3d at 314.

The trial court concluded the police had probable cause to conduct a custodial detention of Gibson *before* the victim's identification and did so while they investigated his gun possession and the trespassing report. *See*

Trial Court Opinion, 1/9/24, at 14. The court also concluded probable cause supported Gibson's "ultimate arrest" because the victim later identified him at the scene of the crime. *See* Trial Court Opinion at 15-16. It accordingly denied Gibson's suppression claim.

We affirm the denial of suppression although on grounds other than those cited by the trial court.[4] We need not determine whether Gibson's presence on deserted streets matching the offender's general description established probable cause because the police did not arrest Gibson until *after* the victim identified him. The law permits the police to protect their safety and preserve the *status quo* during an investigative detention; pointing a gun at a suspect and/or handcuffing him to accomplish that purpose does not convert an investigative detention into an arrest. *See Spence*, 290 A.3d at 314; *Dix*, 207 A.3d at 388 (Pa. Super. 2019). Here, the police officer pointed a gun at Gibson and handcuffed him to ensure his and their safety and to preserve the *status quo* during the brief period it took to bring the victim to the scene to see if he could identify Gibson. That Gibson was placed in the police car *at his own request* during that brief period was not indicia of arrest, but of Gibson's own preference. *See* N.T., 5/22/23, at 22. Considered as a whole, the facts do not show the police subjected Gibson to custodial

---

[4] Where the result is correct, we may affirm a trial court's decision on any proper ground even if not cited by that court. *See Commonwealth v. Lehman*, 275 A.3d 513, 520 n.5 (Pa. Super. 2022).

detention before the victim identified him.  ***See Spence***, 290 A.3d at 314-15.

Gibson's second issue also fails.

Judgment affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 2/24/2025